UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID GARTON,<br><br>    Plaintiff,<br><br>v.<br><br>BWXT TECHNICAL SERVICES GROUP, INC.,<br><br>    Defendant. | Case No. 1:17-cv-00222-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant BWXT Technical Services Group, Inc.'s Motion for Summary Judgment. Dkt. 33. After the Motion was fully briefed, the Court held oral argument on September 23, 2019, and took the matter under advisement. For the reasons set forth below, the Court GRANTS the Motion for Summary Judgment.

## II. BACKGROUND[1]

In March of 2006, Plaintiff David Garton began working for the Idaho National Laboratory as a heavy equipment operator at the Naval Reactor Facility ("NRF"). The NRF is a classified facility operated by the United States Navy within the Idaho National Laboratory. Defendant BWXT Technical Services Group, Inc. ("BWXT") is a subcontractor operating at the NRF. BWXT operates primarily in nuclear facilities, and its

---

[1] Unless otherwise referenced, the following facts are undisputed.

MEMORANDUM DECISION AND ORDER - 1

personnel works with and around radioactive materials, equipment, and hazardous materials and waste. Garton became employed as a Crane Operator for BWXT on October 1, 2010, when BWXT took over the NRF contract from Philotechnics ("POC"), a contract under which Garton was already employed.

While employed at POC, Garton worked with co-workers who would remain co-workers during Garton's time at BWXT, including Rod Severin, an Ironworker foreman. Garton's conflicts with co-workers, specifically with Severin, began in or around 2008. Severin allegedly started harassing Garton by giving him looks of discontent, which Garton described as giving him "the pig eye (as if he couldn't stand the sight of me).'" Dkt. 39-4, ¶ 4. According to Garton, Severin's glare caused him to experience increased feelings of anxiety.

In an August 30, 2012, physical with a third-party medical provider, Dr. Eric Perttula, Garton indicated that he was taking "multiple potential mentation altering medication[s]." Dkt. 36, ¶ 11. Garton's use of such medications prompted Dr. Perttula to pull Garton's Department of Transportation ("DOT Driver") and Crane Qualifications.

Sometime following the physical with Dr. Perttula, but before September 30, 2012, a meeting took place at BWXT between Construction Group Manager Chuck Muller, Curtis Christiansen (a General Foreman), Severin, and Garton. The group called Dr. Perttula to discuss Garton's medication use and the impact it might have on his job. After Garton assured Dr. Perttula that he only took his medications after work or in the evening, Dr. Perttula reinstated Garton's DOT Driver and Crane qualifications.

Garton believes that this meeting was the first time Severin learned of his medication use. According to Garton, almost immediately after the meeting he was informed by another employee, Gary Winthers, that Severin made a comment about Garton being a "pill popper." Dkt. 39-4, ¶ 8. Garton contends that between the meeting in August 2012, until April 2015, Severin and another co-worker, Troy Staggie, referred to him as a "pill popper" on multiple occasions.

On April 15, 2015, Garton submitted a complaint to Tim Walsh, BWXT's local HR Representative at NRF, complaining about Severin's behavior towards him. In addition to other complaints of harassment by Severin, Garton's 2015 complaint to Walsh alleged that Severin labeled him a "pill popper" after the meeting with Dr. Perttula, and that Staggie had also called him a "pill popper." In response to Garton's complaint, BWXT launched an investigation into Garton's claims, which included interviewing Garton, Severin, and other BWXT employees.

BWXT completed the investigation in early May 2015. On May 6, 2015, Walsh and additional HR personnel met with Garton to inform him that BWXT could not conclusively prove Garton's allegations. Later that day, HR personnel met with Muller and emphasized BWXT's expectation that employees treat each other with professionalism and respect, and stressed that there should be no retaliation against Garton for raising his concerns. On May 7, 2015, Walsh and Muller met with Severin and discussed Garton's allegations at length. They reiterated BWXT's standards of professionalism and respect expected of all employees, and informed Severin there was to be no retaliation against Garton.

In April and May 2015, Garton approached managers claiming he was sick and asking if a different employee could handle cranes for him. BWXT began interacting with Garton to try to understand the situation and any accommodations they could make to get him back to crane duties. On May 22, 2015, Garton provided a note from his personal doctor, Gary Soucie, stating Garton could not operate the bridge crane due to "significant panic attacks," but was working through his anxiety so he could return to full duty. Meanwhile, BWXT temporarily allowed Garton to refrain from operating cranes.

On June 11, 2015, Dr. Perttula examined Garton to get clarification on his health situation. Dr. Perttula noted that Garton was to avoid the use of the bridge crane or any crane that had an enclosed cab. On July 10, 2015, Garton provided another note from Dr. Soucie, which stated that Garton could return to work and that he should report to Dr. Soucie if he felt uncomfortable.

On June 29, 2015, Garton appears to have told his healthcare provider that the "[h]arassment has now stopped at work." Dkt. 36, ¶ 33. However, in mid-July 2015, Garton launched a complaint directly with BWXT corporate to dispute the findings of BWXT's first investigation of his April 2015, complaint. Florence Phillips, an attorney for BWXT, investigated Garton's complaint.

On August 13, 2015, confused by the conflicting information it had received from Dr. Perttula and Dr. Soucie regarding Garton's ability to perform his crane duties, BWXT sent a letter to Dr. Perttula asking for additional clarification regarding Garton's condition and restrictions. In its letter, BWXT included information about the NRF site and its high-risk activities. On August 19, 2015, Dr. Perttula pulled a report on Garton's medications,

in an attempt to determine whether Garton was taking any medication that had not previously been reported to him. On August 24, 2015, Dr. Perttula sent a letter to BWXT, revoking Garton's Crane Operator and DOT Driver qualifications pending further evaluation, and requesting both a complete reconciliation of Garton's medications and mental health exam. Dkt. 39-4 ¶ 32, Dkt. 39-3.

On September 2, 2015, Dr. Perttula conducted a follow up exam of Garton. Dr. Perttula disqualified Garton from his DOT Driver and Crane Operator Qualification due to Garton's "Situational Anxiety." Dkt. 35-2, Ex. O. Garton met with his supervisors later that day, who informed him of Dr. Perttula's conclusion and stated he would be placed on unpaid administrative leave in order to regain his qualifications. Garton's union also told BWXT that Garton would work to regain his qualifications.

After he was placed on administrative leave, Garton took no steps to regain his crane operator qualifications, and BWXT heard nothing further from him. On December 12, 2015, BWXT sent a letter to Garton seeking permission to interact with Dr. Perttula to determine any reasonable action BWXT could take to address Garton's limitations. Garton signed the release on December 29, 2015 and returned it January 4, 2106. However, Garton rescinded his authorization later that same day, forbidding BWXT or Dr. Perttula from receiving or providing information. At some point after January 4, 2016, Garton was terminated from BWXT's systems.

BWXT's occupational medicine expert, Dr. Paula A. Lantsberger later reviewed Garton's medical history, conditions, and construction jobs at the NRF. In conducting her review, Dr. Lantsberger found that Garton had repeatedly omitted information and falsified

information on his applications for Commercial Driver Certification and fitness for duty forms since the start of his employment at the NRF. For example, Garton repeatedly failed to accurately disclose his use of numerous disqualifying medications, including Alprazolam, Oxycodone, and Zanaflex. Garton also failed to disclose his anxiety, depression, and narcolepsy diagnoses in his first application for Commercial Driver Certification and in many subsequent fitness for duty forms that he completed.

Dr. Lantsberger concluded that from the time of Garton's initial hiring at the NRF and throughout his time at BWXT, Garton did not meet the criteria for performing the duties of a crane operator.

Garton filed this case on May 23, 2017. He later filed an Amended Complaint on August 7, 2017. The parties stipulated to dismissal of Count I of the Amended Complaint on August 16, 2017. On March 8, 2019, BWXT filed the pending Motion for Summary Judgment on Garton's remaining claims for discrimination in violation of the Americans with Disabilities Act ("ADA")[2] based on disparate treatment, discrimination in violation of the ADA based on hostile work environment, and discrimination in violation of the ADA based on failure to accommodate. The motion has been fully briefed and is ripe for decision.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[2] The ADA is codified at 42 U.S.C. § 12101-12213 (West 2009).

Civ. P. 56(a). This Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, this Court must "view[] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, this Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## IV. ANALYSIS

Garton alleges that BWXT violated the ADA when it placed him on administrative leave after Dr. Perttula determined Garton's Situational Anxiety disqualified him from operating a crane, an essential function of his job. Pursuant to the ADA, Garton brings claims for disparate treatment, failure to accommodate and a hostile work environment. Because Garton's disparate treatment and failure to accommodate claims both turn on the same element, or whether Garton can establish he was able to perform the essential

functions of the job with or without reasonable accommodation, the Court turns first to Garton's claim for discrimination under the ADA based on a hostile work environment.

## A. Hostile Work Environment Claim

In Count Three, Garton alleges that he was subjected to a hostile work environment in violation of the ADA. The Ninth Circuit has not explicitly recognized a claim for hostile work environment under the ADA. *See Garity v. APWU National Labor Org.*, 655 Fed. App'x 523, 524 (9th Cir. 2016) (assuming without deciding that such claim exists within the circuit); *Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003) (declining to decide the issue). Several other circuits, however, have recognized a hostile work environment claim under the ADA because of the similarity between the language of the ADA and Title VII. *See, e.g., Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719–20 (8th Cir. 2003); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 175 (4th Cir. 2001); *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 233 (5th Cir. 2001). This Court has also recognized the viability of a hostile work environment claim under the ADA. *See Mallard v. Battelle Energy All., LLC*, 2013 WL 2458620, at *8 (D. Idaho 2013); *Velasco v. Broadway Arctic Circle, LLC*, 2012 WL 2505291, at *1 (D. Idaho 2012).

Assuming for purposes of the instant motion that the Ninth Circuit would recognize a hostile work environment claim under the ADA, Garton must show that: (1) he is a qualified individual with a disability under the ADA; (2) he suffered from unwelcome harassment; (3) the harassment was because of his disability or a request for accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive working environment; and (5) the

employer knew or should have known of the harassment and failed to take prompt remedial action. *Mallard*, at *8 (citing *Walton v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999)).

BWXT seeks summary judgment on Count Three, arguing that Garton cannot establish either that he is a qualified individual with a disability under the ADA, or that the alleged conflicts with his co-workers were because of an asserted and protected disability. BWXT further contends that Garton cannot show that his alleged harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive working environment.

The ADA defines "disability" with respect to an individual as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such impairment. 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2. "[T]hat the Act defines 'disability' 'with respect to an individual' makes clear that Congress intended the existence of a disability to be determined in [a] case-by-case manner." *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002) (internal citation omitted); *see also Atencio v. Joint Jerome Sch. Dist. No. 261*, 837 F. Supp. 2d 1158, 1164–65 (D. Idaho 2011).

BWXT first suggests Garton cannot present triable issues of fact to establish any of his three alleged disabilities—anxiety and depression, sleep deprivation, and restless leg syndrome—are actionable predicates for his ADA hostile work environment claim.[3]

---

[3] Although Garton's does not identify a specific disability in his Amended Complaint, in an answer to an interrogatory, Garton stated that his disparate treatment claim is based on anxiety and depression, sleep

"There are three ways to be 'disabled' under the ADA," including "actual" disability, "record of" disability, and "regarded as" disabled. *Taylor v. Renown Health*, 675 Fed. App'x 676, 677 (9t Cir. 2017); 42 U.S.C. § 12102(1)(A)-(C); 29 C.F.R. § 1630.2. Garton alleges that his sleep deprivation and restless leg syndrome qualify as "record of" disabilities, and suggests his anxiety and depression qualify as a "regarded as" disability.

"To have a record of impairment that substantially limits a major life activity means to have 'a history of, or [have] been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" 39 C.F.R. § 1630.2(k). However, in order to proceed under a "record of" disability, Garton must establish that said disability substantially limits one or more of his major life activities. *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 886 (9th Cir. 2004). Garton has not met his burden of specifying which, if any, major life activities are limited by his alleged "record of" sleep deprivation or reckless less syndrome disabilities. Therefore, Garton's hostile work environment claim proceeds solely on his allegation that he was "regarded as" having anxiety and depression.

As this Court recently made clear in *Astorga v. Idahoan Foods, LLC*, 2019 WL 4120803, at *5 (D. Idaho 2019), a "regarded as" disability must be plead in the complaint. As the Court reads Garton's Amended Complaint, Garton has alleged only that he was regarded by BWXT as having a "mental impairment." Dkt. 14, at ¶¶ 36, 43. Nowhere in the Amended Complaint does Garton state that he is claiming anxiety and depression as a

---

deprivation and restless leg syndrome. Dk. 35, Exhibit P. Because BWXT does not contest the failure to properly plead these disabilities, the Court will proceed as if they were properly plead.

"regarded as" disability. However, BWXT does not appear to contest Garton's failure to properly plead anxiety and depression as a "regarded as" impairment. Consequently, the Court will proceed as if Garton properly plead anxiety and depression as a "regarded as" disability.

An individual meets the requirement of being "regarded as" having a particular impairment if the individual establishes that he has been subject to discrimination because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A). Garton must thus demonstrate that he suffered unwelcome harassment because of his harasser's perception that he had anxiety and depression. Garton's hostile work environment claim centers on the "pill popper" comments made by Severin and Staggie. However, Garton does not claim that Severin and Staggie knew about his anxiety and depression, but rather that they were made of aware of his use of pain medication. Dkt. 39-4, at ¶ 5–6. Garton also claims that he was subjected to discriminatory conduct because his alleged harassers perceived him as "having a physical impairment in operating cranes due to his medication use." Dkt. 39, at 7.[4] But Garton does not claim that his harassers perceived him as having anxiety and depression.

---

[4] In Garton's Amended Complaint, under General Allegations, he alleges that Severin and other co-workers "perceived [Garton] as having a mental impairment and bullied, harassed and discriminated against [Garton] for what they perceived as his mental state and competency." Dkt. 14, at ¶ 17. Later, in Garton's response to the Motion for Summary Judgment, Garton alleges that "Rod Severin and Troy Staggie treated [Garton] as having a physical impairment." Dkt. 39, at 7. It is therefore unclear what disability, if any, Garton is claiming he was "regarded as" having. Regardless of this lack of clarity, nowhere does Garton allege that he was regarded as having anxiety and depression, which is the only "regarded as" disability he named in his response to BWXT's interrogatory.

Garton also complains that he was subjected to generally demeaning treatment by Severin, including receiving disparaging looks from Severin on occasion. Dkt. 39-4, at ¶ 4. Again, Garton has failed to claim that any of Severin's conduct was because Severin regarded Garton as having anxiety and depression. Accordingly, Garton has not alleged facts that would allow a reasonable jury to find that he was harassed because of a protected and asserted disability. Garton's claim fails on this element alone. However, even if Garton had established a triable issue of fact that he was harassed because he was "regarded as" having anxiety and depression, the alleged conduct was not sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive work environment.

The Supreme Court has explained that in determining whether an environment is sufficiently hostile or abusive, a district court must look at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or just a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (internal citation omitted). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *Id.* These standards properly filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language and occasional teasing. *Id.* (internal citation omitted). Conduct must be extreme to amount to a change in the terms and conditions of employment. *Id.*

For example, in *Kang v. U. Lim America, Inc.*, 296 F.3d 810, 814 (9th Cir. 2002), the plaintiff suffered verbal abuse for up to three hours a day, endured multiple instances

of physical abuse by his supervisor, and was subject to "discriminatorily long work hours." The fact that the abuse was "physically threatening or humiliating" and that it unreasonably interfered with the plaintiff's work performance, lead the Ninth Circuit to conclude that the plaintiff presented evidence sufficient to survive summary judgment on a hostile work environment claim. *Id.* at. 817. Similarly, in *Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 872 (9th Cir. 2001), the plaintiff endured weekly verbal abuse over a period of several years, including habitual sexually derogatory name-calling. The abuse came from the plaintiff's co-workers, as well as his supervisor. *Id.* The Ninth Circuit found that such conduct was sufficiently severe and pervasive to create a hostile work environment. *Id.* at 872–75. By contrast, Garton's primary complaint is that he was allegedly called a "pill popper" by Severin or Staggie approximately ten times between August 2012, and September 2015. Dkt. 36, at ¶¶ 18–21. Garton also complains that he received disparaging looks from Severin approximately 20 times over the course of seven years. Dkt. 39-4, at ¶ 4. Unlike the plaintiff in *Kang*, Garton was never subject to physical abuse. Although he may have been subject to occasional disparaging comments or looks, unlike both *Kang* and *Nichols*, the alleged conduct occurred sporadically over a period of three to seven years. Further distinct from both *Kang* and *Nichols*, it appears the alleged harassment was by Garton's similarly situated co-workers rather than a supervisor.[5] This falls short of the

---

[5] Garton claims Severin was his supervisor. Dkt. 35-1, Ex. A at 55:8-25-56:1-21. However, Severin had no authority to hire, discipline, suspend, or terminate Garton. *Id.* at 59:14-25-60:1-10. Garton's opinion that Severin was his supervisor was based on his observation that Severin got along well with another manager and was one of the better ironworkers on the site. *Id.* at 55: 8-25-56:1-25.

severe, pervasive harassment needed to support a hostile work environment claim. Garton's claim fails on this element as well. *Id*

Because Garton does not offer sufficient facts to support the third and fourth elements of a hostile work environment claim, the Court grants the Motion for Summary Judgment on Count Three.

### B. Disparate Treatment and Failure to Accommodate Claims

In Counts Two and Four, Garton asserts claims of disability discrimination in violation of the ADA. Specifically, Garton claims BWXT violated the ADA when they subjected him to disparate treatment and failed to accommodate him by placing him on unpaid administrative leave.

To establish a prima facie case for disability discrimination under the ADA, an employee must show that: (1) he is disabled within the meaning of the ADA; (2) he is a qualified individual under the ADA, meaning he is able to perform the essential functions of the job with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. *Higgins v. Nw. Farm Credit Servs.*, ACA, 2018 WL 2050132, at *10 (D. Idaho 2018) (internal citations omitted); *see also Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012).

For purposes of summary judgment, BWXT notes any claim concerning failure to accommodate premised on any "regarded as" disability necessarily fails because "there is no duty to accommodate an employee in an 'as regarded' case." Dkt. 34, at 13 (citing *Taylor*, 675 Fed. App'x at 677). However, even assuming that Garton is disabled within the meaning of the ADA and that he suffered an adverse employment action because of his

disability, BWXT argues Garton cannot survive summary judgment because he was not able to perform the essential functions of his job with or without reasonable accommodation, as required under the ADA. Dkt. 34, at 14.[6]

The ADA defines "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Consideration is given to the employer's judgment as to what functions of a job are essential. *Id.* The determination of whether an employee is qualified is to be made at the time of the alleged discriminatory conduct. *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1230 (9th Cir. 2003) (citing *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1112 (9th Cir.2000)).

BWXT argues that Garton could not perform the essential functions of his job at the time he was placed on administrative leave because he lacked the requisite certifications to operate a crane. Dkt. 34, at 14–15. An ADA plaintiff bears the burden of proving he has the skills, experience, education, and other job-related requirements necessary for their position. *Samper*, 675 F.3d at 1237. "[O]ther job-related requirements" include, among other things, certifications concerning "physical, medical and other requirements established by a covered entity as requirements for which an individual must meet in order

---

[6] Should the case proceed to trial, BWXT does otherwise dispute and reserves the right to dispute that Garton was disabled and that he suffered an adverse employment action as a result. Dkt. 34, at 14. For example, BWXT suggests that placing Garton on leave was a form of reasonable accommodation to allow him to regain qualification for his job and was thus not an adverse action. *Id*. at 14, n. 6.

to be eligible for the position." 29 C.F.R. § 1630.2(q). Here, under Navy policy, Garton was required to have both DOT Driver clearance and clearance under Section 7 of the Naval Facilities Engineering Command Navy Crane Center P-307 requirements (NACFAC P-307) in order to work as a crane operator at BWXT. Dkt. 36, at ¶ 39–40.

In his September 2, 2015, assessment of Garton, Dr. Perttula stated the he "[does] not believe [Garton] can perform the bridge crane function, which is listed as an essential job function for him." Dkt. 14, at ¶ 27. Garton himself acknowledges that crane operation was an essential job function. Dkt. 14, at ¶ 28. In addition to Dr. Perttula's assessment that Garton was unable to operate the bridge crane, an essential function of his job, Dr. Perttula revoked Garton's DOT Driver and Crane Operator Qualifications, including his clearance under NAVFAC P-307 Section 7. Dkt. 35-2, Ex. O.

Garton initially argued that he never lost his qualifications as a crane operator. Dkt. 14, at ¶ 30. However, Garton later acknowledged that his qualifications had been pulled at the time BWXT placed him on administrative leave. Dkt. 39, at 11. It is thus undisputed that Garton lacked the requisite qualifications to work as a crane operator at the time BWXT placed him on administrative leave. In addition to being unable to perform the essential job function of operating the bridge crane, Garton was entirely precluded from working as a crane operator for BWXT because he lacked the necessary qualifications required by Navy policy. In support of its Motion for Summary Judgment, BWXT submitted the report of Dr. Lantsberger, which detailed Garton's failure to disclose his disqualifying conditions and medication use. Dkt. 35-3, Ex. U. Dr. Lantsberger found that Garton lacked the requisite qualifications to perform the duties of a crane operator. Garton

does not dispute the findings of Dr. Lantsberger. Notably, in his deposition, Garton admitted to having narcolepsy and depression during his employment with BWXT. Dkt. 39-2, Ex. 2 at 197:12-24; 242:1-2., 242; Dkt. 39-3, at 266:21-267:20. Both conditions disqualified Garton from meeting the criteria for a Crane Operator at a nuclear facility. Dkt. 35-3, Ex. U at 1, 6.

During oral argument, counsel for BWXT represented that not only was Garton unqualified for a position as a crane operator at the time of the alleged discriminatory conduct in 2015, he was unqualified from the start of his employment at BWXT. When he first completed a fitness for duty form for BWXT in 2010, Garton failed to disclose his use of numerous mentation affecting prescription medications, as well as his diagnoses of anxiety, depression, and narcolepsy. Dkt. 35-8, Ex. BB, at 27. Both the use of such medications and the various diagnoses preclude employment at the Naval Reactor Facility. Dkt. 35-3, Ex. U at 6–7. According to counsel, had Garton accurately completed this initial fitness for duty form in 2010, he would not have been given employment as a crane operator at BWXT. This is consistent with Dr. Lantsberger's finding that Garton was unqualified from the beginning of his employment at the NRF. Dkt. 35-3, Ex. U at 2 (stating "Mr. Garton had multiple medical conditions that would have prevented him from being certified as a Crane Operator or as a Commercial Driver.")

Counsel for BWXT further alleged that Garton failed to accurately complete a second fitness for duty form in 2012, when he again did not completely disclose his use of prescription medications and failed to disclose his diagnoses of anxiety, depression, and narcolepsy. Dkt. 35-8, Ex. BB, at 29. While Garton did disclose some medication use in

the 2012 form, he did not disclose all of the medications he was taking in 2012. Dkt. 35-8, Ex. BB at 29. Nor did Garton disclose any medications (other than blood pressure medication) in his 2014 fitness for duty form. Dkt. 35-8, Ex. BB, at 30. Garton never disputes that he failed to accurately complete his fitness for duty forms. As Dr. Lantsberger explained, Garton's medical history not only precluded him from working as a crane operator, but also from safely working at BWXT at all:

> Mr. Garton has claimed in his deposition that he would have been able to work as a laborer or as a decontamination technician. However, given the entire medical history, his history of polypharmacy, his possession of multiple sedating medications at work, his history of concealing his medical conditions in the past, and the multiple diagnoses of anxiety, depression, narcolepsy, sleep disorders, opiate use, benzodiazepine use in combination with other sedating medications, he could not safely operate equipment, work in confined spaces, climb ladders, scaffolds or work at heights. He could not work safely around others on a construction site, such as NRF.

Dkt. 35-3, Ex. U at 7.

Because Garton has offered no evidence to rebut BWXT's claims that he was unqualified throughout the entirety of his employment, including at the time of the alleged discriminatory conduct, Garton has not alleged sufficient facts to establish that he is a qualified individual under the ADA. The Court accordingly finds good cause to grant BWXT's Motion for Summary Judgement on Counts Two and Four.

### V. CONCLUSION

As outlined above, Garton failed to provide sufficient facts in support of the elements necessary to establish a *prima facie* case for his three remaining ADA claims. Summary Judgment in BWXT's favor is appropriate.

# VI. ORDER

IT IS HEREBY ORDERED:

1. BWXT's Motion for Summary Judgment (Dkt. 33) is GRANTED in its entirety.

2. This Court will enter judgment separately in accordance with Fed. R. Civ. P. 58.

DATED: January 7, 2020

_____
David C. Nye
Chief U.S. District Court Judge